UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ERICA E. O'BRIEN,                    )
                                     )
            Plaintiff,               )
                                     )
       v.                            )        No. 4:11 CV 507 DDN
                                     )
                                     )
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security,     )
                                     )
            Defendant.               )


**MEMORANDUM**

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the application of plaintiff Erica E. O'Brien for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 10.) For the reasons set forth below, the court affirms the decision of the Administrative Law Judge (ALJ).


**I. BACKGROUND**

On December 11, 2006, plaintiff Erica E. O'Brien, who was born in 1969, applied for disability insurance benefits, alleging she has been disabled since July 12, 2003. (Tr. 85-92.) She alleged disability on account of abdominal hernias and adhesions, anxiety, post traumatic stress disorder, and depression. (Tr. 11, 105.) Her claims were denied initially on March 20, 2007, and she requested a hearing before an ALJ.[1] (Tr. 48-52.)

_____

[1]Missouri is one of several test states participating in modifications to the disability determination procedures which apply in this case. 20 C.F.R. §§ 404.906, 404.966 (2007). These modifications include, among other things, the elimination of the reconsideration step. See id.

On January 2, 2009, following a hearing, the ALJ found O'Brien was not disabled. (Tr. 11-16.) On January 13, 2011, the Appeals Council, after considering additional evidence, denied her request for review. (Tr. 1-5, 486-91.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  MEDICAL HISTORY

On April 29, 1998, O'Brien was admitted at Jefferson Memorial Hospital because she was in labor. She had a primary Cesarean section. She recovered well and was discharged on May 2, 1998 with instructions to take Tylenol and follow-up in one week. (Tr. 204-07.)

On May 6, 1998, O'Brien was seen at Jefferson Memorial Hospital for a fever, chills, diaphoresis,[2] and a tender, red, swollen abdomen from the Cesarean section. Gregg Ginsburg, M.D., recommended that her wound be drained and that she be evaluated for possible fasciitis.[3] (Tr. 195-99.) Dr. Ginsburg performed the operation the next day. O'Brien tolerated the procedure well and was in stable condition after the operation. (Tr. 200-01.)

From September 1998 through September 2002, O'Brien visited Fred Monterubio, M.D., for a variety of conditions, including cramping, pelvic pain, abdominal pain, and heavy bleeding. (Tr. 223-26.) On October 5, 1998, Dr. Monterubio noted that O'Brien weighed 260 pounds and was "moody/depressed" since giving birth in April 1998 and since her parents' deaths. (Tr. 226.)

On April 2, 1999, a pelvic ultrasound revealed possible fibroids of the uterus but no focal or adnexal masses.[4] (Tr. 338.)

---

[2]Diaphoresis is another term used for perspiration, or sweating. Stedman's Medical Dictionary 533, 1467 (28th ed. 2006).

[3]Fasciitis is inflammation if the fascia, which is a sheet of fibrous tissue that envelops the body beneath the skin and encloses muscles and groups of muscles and separates their several layers or groups. Stedman's at 700, 706.

[4]Uterine fibroids are noncancerous growths of the uterus. Mayo Clinic, http://www.mayoclinic.com/health/uterine-fibroids/DS00078 (last
(continued...)

On December 3, 1999, O'Brien was seen by Harpartap S. Sandhu, M.D., at Jefferson Memorial Hospital for severe headaches, vertigo,[5] and nausea. A CT scan of her head was normal. Dr. Sandhu diagnosed vertigo, questionably secondary to vestibular neuronitis,[6] and a headache, and prescribed Darvocet and Meclizine.[7] Dr. Sandhu directed O'Brien to drink fluids and follow-up with her physician within a week. (Tr. 192-94.)

On March 15, 2000, O'Brien sought treatment at Jefferson Memorial Hospital for pain in her right eye. She was directed to wear an eye patch for the next day, use eye drops, and take Tylenol. (Tr. 188-89.)

On February 17, 2001, O'Brien was treated for a urinary tract infection and pelvic pain at Jefferson Memorial Hospital. (Tr. 185-87.)

In a Prenatal Questionnaire completed on June 29, 2001, O'Brien reported being five feet, four inches tall and weighing 270 pounds. (Tr. 233.)

On July 8, 2001, O'Brien underwent a dilation and curettage procedure.[8] (Tr. 332.)

From March 4, 2002 through March 7, 2002, O'Brien was voluntarily admitted to Jefferson Memorial Hospital after her physician noted that she was experiencing increased anxiety, increased mood swings, suicidal thoughts, suicidal ideation, rage, and an inability to calm down. She reported a history of anxiety, agitation, nervousness, and depression. Her parents and sister had died the year before, and she had recently had

---

[4](...continued)
visited January 4, 2012).

[5]Vertigo is a sensation of spinning, usually associated with dizziness. Stedman's at 2119.

[6]Vestibular neuronitis is a short, possibly frequent attack of severe vertigo, not accompanied by deafness or ringing in the ears, often following a nonspecific upper respiratory infection. Stedman's at 1312.

[7]Darvocet is used to relieve mild to moderate pain. Meclizine is used to treat nausea. WebMD, http://www.webmd.com/drugs (last visited January 4, 2012).

[8]Dilation and curettage is a procedure involving dilation of the cervix and curettement or scraping of the endometrium, the inner layer of the uterine wall. Stedman's at 471, 542.

a miscarriage.  She stated, "I've been suicidal.  I have extreme panic attack[s], sometimes rage.  I cannot control myself."  (Tr. 179-84.)

Upon admission, she was put on suicide precaution and prescribed Celexa and Xanax.[9]  She reported a history of depression in her family and that her sister had gone through postpartum depression.  Ahmad Ardekani, M.D., noted that O'Brien was very sad, depressed, and had a low mood, but with her medications she slept better, stopped crying, and her suicidal thoughts disappeared.  Dr. Ardekani opined that O'Brien had major depression, panic and anxiety problems, obsessive compulsive disorder (OCD), moderate psychosocial and environmental problems, and a GAF of "[a]round 40% function."[10]  Upon discharge, O'Brien was going to start a partial day program for further treatment because she had many issues that she needed to resolve.  (Id.)

From March 8, 2002 through April 4, 2002, O'Brien underwent treatment through a partial day program at Jefferson Memorial Hospital. She was diagnosed with major depression, panic attacks, and OCD.  She participated in group therapy and individual counseling.  During treatment, she was not suicidal or homicidal.  Dr. Ardekani changed her medication from Celexa to Zoloft, and continued her prescriptions of Xanax and Restoril.[11]  Her mood and affect improved, and she was

---

[9]Celexa is used to treat depression.  Xanax is used to treat panic and anxiety disorders.  WebMD, http://www.webmd.com/drugs (last visited January 4, 2012).

[10]A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function.  A GAF score has two components.  The first component covers symptom severity and the second component covers functioning.  A patient's GAF score represents the worst of the two components.
On the GAF scale, a score from 31-40 means there is impairment in reality testing or communication (such as speech that is at times illogical, obscure, or irrelevant), or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (such as depressed, avoids friends, neglects family, and is unable to work).  Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed., American Psychiatric Association 2000).

[11]Zoloft is used to treat depression.  Restoril is used to treat insomnia.  WebMD, http://www.webmd.com/drugs (last visited January 4,
(continued...)

- 4 -

discharged to home.  Dr. Ardekani recommended that O'Brien return for a follow-up.  (Tr. 178.)

On June 27, 2002, O'Brien was seen at the Jefferson Memorial Hospital emergency room for chest palpitations and shortness of breath. She reported a history of depression and anxiety.  Martha Reed, M.D., conducted an electrocardiogram (EKG) and diagnosed sinus tachycardia with one ventricular premature contraction,[12] possible right atrial enlargement.  Dr. Reed noted that O'Brien's heart rate had increased since her previous EKG and that ventricular premature contraction was now seen but required clinical confirmation.  (Tr. 171-76.)  Chest x-rays revealed that O'Brien's cardiomediastinal silhouette[13] was within normal limits and her lungs were clear, but also that there were mild degenerative changes within her thoracic spine.  Daryl Henderson, M.D., opined that O'Brien had acute cardiopulmonary abnormality.  (Tr. 176.)

On July 3, 2002, O'Brien was admitted through the emergency room at Jefferson Memorial Hospital for vague precordial[14] and chest discomfort, palpitations, and irregular heart beat.  She had been having the symptoms for almost a week.  Charles Padmini, M.D., noted that O'Brien was well-nourished, obese, and in no acute distress.  Dr. Padmini's impressions were cardiac arrhythmia,[15] atypical chest pain, obesity, and that the etiology of the arrhythmia would have to be determined to rule out ischemic heart disease.  (Tr. 162-63.)  A consulting physician, Jung H. Lee, M.D., noted impressions of symptomatic singular ventricular

---

[11](...continued)
2012).

[12]Sinus tachycardia is the rapid beating of the heart originating in the sinoatrial node.  Stedman's at 1931.

[13]The cardiac silhouette is the most prominent central feature of a chest x-ray.  Yale University School of Medicine, Cardiothoracic Imaging, available at http://www.yale.edu/imaging/findings/normal_heart/index.html (last visited January 4, 2012).

[14]Precordial refers to the epigastrium and anterior surface of the lower part of the thorax.  Stedman's at 1553.

[15]Cardiac arrhythmia is an abnormality in the rate, regularity, or sequence of cardiac activation.  Stedman's at 137, 601.

premature beat, etiology unknown, possible primary, and a history of depression.  Dr. Lee concluded from a Holter Monitor Report[16] that O'Brien's symptoms of palpitations and shortness of breath were concurrent with a single ventricular premature beat.  Dr. Lee recommended a stress echocardiographic study and Doppler study,[17] for O'Brien to avoid caffeine and alcoholic beverages, and to try a Beta blocker after a stress test.  (Tr. 164-65, 170.)

A Doppler study and stress test conducted the next day were normal except for indicating sinus tachycardia.  At the time of the tests, O'Brien was five feet, four inches tall and weighed 234 pounds.  Dr. Lee noted that O'Brien had sedentary activity tolerance, no exercise-induced cardiac arrhythmia, no exercise-induced chest pain, and no EKG evidence of myocardial ischemia.[18]  (Tr. 168-69.)

On August 17, 2002, O'Brien was seen at Jefferson Memorial Hospital for treatment of a skin rash caused by poison ivy.  She was prescribed Depo-Medrol.[19]  (Tr. 160-61.)

From September 2002 through January 2007, O'Brien was seen by Dr. Monterubio for a range of complaints, including pelvic pain, a sinus infection, back pain, urine leakage, right-side pain, and gastric discomfort.  Dr. Monterubio also treated O'Brien following an operation. (Tr. 218-21.)

---

[16]Holter monitoring is a technique for long-term, continuous, usually ambulatory, recording of electrocardiographic signals on magnetic tape for scanning and selection of significant but fleeting changes that might otherwise escape notice.  Stedman's at 1227.

[17]A Doppler is a diagnostic instrument used for detecting peripheral vascular and cardiac disease.  It emits an ultrasonic beam into the body and tracks changes in the beam's frequency as it is reflected from moving structures.  Stedman's at 580.

[18]Myocardial ischemia is the inadequate circulation of blood to the myocardium, usually as a result of coronary artery disease.  Stedman's at 1001.

[19]Depo-Medrol is used to treat a variety of conditions including skin rashes.  WebMD, http://www.webmd.com/drugs (last visited January 4, 2012).

On September 12, 2002, O'Brien underwent elective sterilization performed by Dr. Monterubio. During the surgery, extensive adhesions in her pelvis were discovered, requiring laparotomy to complete the surgery. Upon discharge two days later, she was restricted from heavy lifting for six to eight weeks and instructed to return in four to six days for removal of surgical staples. (Tr. 321-24, 329-30.)

On May 30, 2003, a pelvic CT scan revealed a left ovarian cyst. (Tr. 302-03, 320.) A June 13, 2003 pelvic ultrasound was inconclusive. (Tr. 319.) The ovarian cyst was no longer present in a June 20, 2003 MRI. (Tr. 300, 315.)

On July 10, 2003, Dr. Monterubio performed an exploratory laparotomy with extensive adhesiolysis,[20] a total abdominal hysterectomy and bilateral salpingo-oophorectomy,[21] and a repair of the sigmoid colon. The surgeries were performed to relieve chronic pelvic pain. Following the surgery, O'Brien was restricted from heavy lifting for twelve weeks and from intercourse for four to six weeks. She was discharged on July 14, 2003. (Tr. 288-98, 304-05, 317.)

On August 23, 2003, O'Brien was seen at Jefferson Memorial Hospital for pain and swelling in her left ankle. At the time of the examination, she weighed 267 pounds. (Tr. 156-58.) X-rays revealed an inferior calcaneal spur and soft tissue swelling but no fracture. (Tr. 159.)

On July 15, 2004, pelvic and abdominal CT scans revealed status post hysterectomy and were otherwise normal. (Tr. 306.)

On December 23, 2004, O'Brien was seen at Jefferson Memorial Hospital for neck pain following a motor vehicle accident. Imaging of her cervical spine revealed straightening of the lordotic curve[22] but no fractures. (Tr. 153-55.)

---

[20]Adhesiolysis is the severing of adhesions, usually performed by laparoscopy or laparotomy. Stedman's at 29.

[21]A salpingo-oophorectomy is the removal of the ovary and its uterine tube. Stedman's at 1716.

[22]Lordosis is an anteriorly convex curvature of the spine. Stedman's at 1119.

On January 25, 2005, an abdominal CT scan revealed a tiny indeterminate pulmonary nodule in the right lower lobe but was otherwise normal. A pelvic CT scan revealed status post hysterectomy and was otherwise normal. (Tr. 285-86.)

On February 18, 2005, O'Brien was seen at Jefferson Memorial Hospital upon complaints of right abdominal pain. Steven Kurweil, M.D., assessed possible cholelithiasis[23] and possible biliary colic and recommended hydration and observation. An abdominal ultrasound revealed mild fatty infiltration of the liver, no evidence of gallstones, and no evidence of dilation of the bile duct. A CT scan revealed a probable hysterectomy and obesity. (Tr. 144-45, 149-50.)

On March 8, 2005, O'Brien was admitted at Missouri Baptist Medical Center upon complaints of abdominal pain in her right side. Diagnoses were chronic cholecystitis and dyskinesia.[24] O'Brien was scheduled for a laparoscopic cholecystectomy[25] that day, which Don Pruett, M.D., performed successfully. (Tr. 276-80.)

On March 19, 2005, O'Brien complained of chest pain. A CT scan of her chest revealed no radiographic evidence of active disease and a normal heart size. (Tr. 274-75.)

On April 12, 2005, Christopher Pruett, M.D., performed a laparoscopic exploration and adhesiolysis upon O'Brien's complaints of abdominal pain. Dr. Christopher Pruett noted that O'Brien was morbidly obese and had undergone laparoscopic cholecystectomy in the recent past. During the laparoscopy, Dr. Christopher Pruett discovered that the adhesions were extensive and had to perform open laparotomy to remove the adhesions. O'Brien tolerated the procedure well and was discharged on

---

[23]Cholelithiasis is the presence of concentrations in the gallbladder or bile ducts. Stedman's at 366.

[24]Cholecystitis is inflammation of the gallbladder. Dyskinesia refers to difficulty in performing voluntary movements, usually in relation to various extrapyramidal disorders. Stedman's at 365, 598.

[25]Cholecystectomy is the surgical removal of the gallbladder. Stedman's at 365.

April 16, 2005 with instructions to follow-up within the week. (Tr. 266-72.)

On September 13, 2006, CT scans of O'Brien's abdomen and pelvis were performed upon complaints of left lower quadrant pain. The abdominal CT scan revealed clear lungs, a normal liver, and no bowel obstruction. A pelvic CT scan revealed scattered diverticula[26] in the descending colon without pericolonic inflammatory change and some soft tissue infiltrates in the subcutaneous fat in the anterior abdominal wall,[27] which was likely related to a previous surgery. (Tr. 261-62.)

On October 3, 2006, Dr. Christopher Pruett surgically repaired a hernia in O'Brien's left abdominal wall which was causing pain. In his report, Dr. Christopher Pruett noted O'Brien's morbid obesity. The surgery was successful and O'Brien did not suffer from complications. (Tr. 256-58.)

On November 3, 2006, an abdominal CT scan revealed post-operative changes associated with left anterior abdominal wall surgery, status post cholecystectomy, and a non-specific three millimeter nodule in the right lung base that had not changed since July 15, 2004. A pelvic CT scan revealed post-operative changes and post-operative fluid collection in the left anterior abdominal wall. (Tr. 251.)

From February 2005 through January 2007, O'Brien was seen by Dr. Don Pruett and Dr. Christopher Pruett upon complaints of abdominal pain. Her obesity was frequently noted. (Tr. 344, 352-53, 356, 359, 361, 364-65, 367-68, 370-72, 377-80.) On February 25, 2005, Dr. Don Pruett noted that O'Brien was five feet, four inches tall and weighed 276 pounds. He also opined that O'Brien's pain was "probably more compatible with gallbladder disease than anything." (Tr. 377.) On April 21, 2005, Dr. Don Pruett wrote Dr. Monterubio detailing O'Brien's history of severe adhesions, which Dr. Don Pruett had removed on March 8, 2005. Dr. Don Pruett had also seen O'Brien the previous day, at which time O'Brien "felt terrific

---

[26]Diverticula are pouches or sacs opening from a tubular or saccular organ, such as the gut or bladder. Stedman's at 575.

[27]Fatty infiltration is the abnormal accumulation of fat droplets in the cytoplasm of cells. Stedman's at 970.

and stated that her abdominal pain was gone." (Tr. 371.) On October 19, 2006, O'Brien complained of nausea and vomiting. (Tr. 355.)

From February 2005 through February 2007, O'Brien was seen on various occasions by Padmini Charles, M.D.. On February 18, 2005, Dr. Charles noted that O'Brien complained of pain in her right side. On March 9, 2006, Dr. Charles noted that O'Brien had anxiety, was angry, and had difficulty sleeping. On September 1, 2006, Dr. Charles noted that O'Brien stated that her Cymbalta was making her nauseous. (Tr. 385-89.)

On November 24, 2006, a MRI of the abdomen revealed a small benign-appearing cyst associated with O'Brien's left ovary. (Tr. 250.) On November 29, 2006, a pelvic ultrasound revealed a small cystic mass on the left side of her pelvis, but was not well-visualized by ultrasound. (Tr. 247-49.) On December 5, 2006, a small amount of fluid was collected from a left abdominal abscess for culture. (Tr. 244-45.) On December 13, 2006, an ultrasound of O'Brien's kidneys revealed no evidence of renal mass, a normal urinary bladder, and possible fatty infiltration of the liver. (Tr. 246.)

An abdominal CT scan performed on January 8, 2007 revealed a stable three millimeter nodule in O'Brien's right lower lobe and mild diffuse fatty infiltration of her liver, but was otherwise normal. A pelvic CT scan revealed improving post-surgical changes in the left anterior pelvic wall and was otherwise normal. (Tr. 242-43.)

On March 20, 2007, James Spence, Ph.D., completed a Psychiatric Review Technique form regarding O'Brien's mental health through December 31, 2003. Dr. Spence noted that O'Brien suffered from major depression, panic attacks, and OCD, but Dr. Spence was unable to complete the form due to insufficient evidence. (Tr. 390-400.)

From April 2007 through August 2008, O'Brien was seen by Andrew Chao, D.O., for treatment of various conditions. On April 16, 2007, O'Brien complained of abdominal pain dating back to October 2006. On April 20, 2007, she complained of lower back pain. On April 27, 2007, she complained of lower back and pelvic pain. On May 7, 2007, she was prescribed Darvocet, which was refilled on May 24, 2007. On July 5,

2007, she was prescribed Effexor.[28]  On August 16, 2007, she was reported as having hypertension, palpitations, obesity, and elevated fasting glucose.  On October 3, 2007, she was prescribed Darvocet for pain.  On March 10, 2008, she reported pain in her lower left side, and reported that the pain had not gotten better by March 14, 2008.  On May 28, 2008, she had shingles, which had begun a week and a half earlier, and abdominal pain.  On August 12, 2008, she reported abdominal pain.  (Tr. 453-62.)

On May 14, 2007, O'Brien saw Darin Minkin, D.O., for throbbing pain and cramping in her lower left quadrant dating back to October 2006.  At the time of the appointment, O'Brien was five feet, four inches tall and weighed 300 pounds.  In a letter to Dr. Chao, Dr. Minkin diagnosed chronic lower abdominal pain, likely recurrent ventral incisional hernia in the lower abdomen, and morbid obesity.  Dr. Minkin recommended a diagnostic laparoscopy with adhesiolysis and possible laparoscopic repair of the recurrent ventral hernia.  (Tr. 467-69.)  O'Brien followed-up with Dr. Minkin from July 6, 2007 through October 12, 2007, during which time she complained of abdominal pain.  (Tr. 470-73.)

On August 24, 2007, O'Brien underwent abdominal and pelvic CT scans at Des Peres Hospital upon complaints of lower abdominal pain.  Preliminary diagnoses were abdominal pain and possibly a ventral hernia.  The CT scans showed no evidence of a ventral wall hernia.  (Tr. 405-410.)

On November 1, 2007, O'Brien was admitted at Des Peres Hospital for recurrent abdominal pain, adhesions, and partial small bowel obstruction.  Dr. Minkin performed an exploratory laparotomy after conversion from diagnostic laparoscopy, small bowel resection, release of small bowel obstruction, and extensive adhesiolysis requiring greater than 45 minutes operative time.  O'Brien tolerated the procedure well and was discharged on November 6, 2007.  Upon discharge, she was restricted to lifting no

---

[28]Effexor is used to treat depression.  Estropipate is used to reduce symptoms of menopause.  WebMD, http://www.webmd.com/drugs (last visited January 4, 2012).

more than ten pounds over the next twenty-four days and was prescribed Percocet.[29]  (Tr. 412-25.)

On November 14, 2007, O'Brien followed-up with Dr. Minkin.  Dr. Minkin noted that O'Brien had healed extremely well, her staples were removed, her bowel function was excellent, and her appetite was normal. Dr. Minkin directed her to refrain from any lifting and to return in six to eight weeks.  (Tr. 474-76.)

On March 28, 2008, O'Brien saw Dr. Minkin upon complaints of pain in her middle and lower abdomen.  Dr. Minkin ordered abdominal and pelvic CT scans.  (Tr. 477.)

On March 31, 2008, O'Brien underwent abdominal and pelvic CT scans at Des Peres Hospital.  The CT scans revealed no bowel obstruction or bowel dilatation.  (Tr. 426-30.)

On April 9, 2008, O'Brien was seen and examined by Dr. Minkin for abdominal pain.  Dr. Minkin discussed possible avenues of treatment, and O'Brien agreed to proceed with surgery.  (Tr. 478.)

On April 17, 2008, O'Brien was admitted to Des Peres Hospital upon complaints of abdominal pain and adhesions.  At the time of admission, her medications were Lisinopril, Atenolol, Darvocet, Effexor, and Estropipate.[30]   Dr. Minkin performed an exploratory laparaotomy and extensive lysis of adhesions requiring greater than 45 minutes of operative time.  O'Brien tolerated the procedure well and reported a decrease in pain following the operation.  (Tr. 431-35, 450.)  Upon discharge on April 21, 2008, she was prescribed Vicodin[31] and directed to follow-up with Dr. Minkin in one or two weeks.  (Tr. 445, 450, 452.)

On April 28, 2008, O'Brien followed-up with Dr. Minkin.  Dr. Minkin noted that O'Brien had healed very well, had her staples out, and that her bowel and appetite were excellent.  Dr. Minkin directed her to

---

[29]Percocet is used to help relieve moderate to severe pain.  WebMD, http://www.webmd.com/drugs (last visited January 4, 2012).

[30]Lisinopril and Atenolol are used to treat hypertension.  WebMD, http://www.webmd.com/drugs (last visited January 4, 2012).

[31]Vicodin is used to relieve moderate to severe pain.  WebMD, http://www.webmd.com/drugs (last visited January 4, 2012).

refrain from lifting over ten pounds and to return in three weeks.  (Tr. 479.)

On June 20, 2008, O'Brien followed-up with Dr. Minkin.  She reported feeling much better.  (Tr. 481.)

On September 2, 2008, Dr. Minkin wrote Dr. Chao concerning an upper GI endoscopy procedure performed on O'Brien earlier that day.  Dr. Minkin's impressions were that O'Brien's esophagus was normal, she had gastritis, that her duodenum was normal, and that the examination was otherwise normal.  Dr. Minkin recommended that O'Brien be discharged to home, await pathology results, and return in two weeks.  (Tr. 484.)

On March 12, 2010, Dr. Chao completed a Physical Residual Functional Capacity Questionnaire.  (Tr. 487-90.)  Dr. Chao reported treating O'Brien since 2007 as-needed, that his diagnoses were abdominal pain and severe abdominal adhesions, and that O'Brien's prognosis was guarded. Dr. Chao noted symptoms of pain in the lower abdominal extremities, dizziness from pain medications, and abdominal surgeries at least twice a year with at least two months recovery.  He opined that O'Brien's symptoms arise from adhesions attached to her abdominal wall, and stated that "she has no omentum[32] which causes pulling and tearing pain with movement, it can be constant depending on the circumstances and sometimes not tolerable unless complete[ly] still."  He also reported that O'Brien was depressed from living with pain, had a high pain tolerance, and was taking Vicodin.  He opined that O'Brien's impairments lasted or could be expected to last at least twelve months, that O'Brien is not a malingerer, and that depression and anxiety from the abdominal pain contributed to the severity of her symptoms.  (Tr. 487.)

Dr. Chao opined that O'Brien's impairments were reasonably consistent with her symptoms and functional limitations, and that O'Brien's pain and other symptoms are severe enough to frequently interfere with her attention and concentration needed to perform even simple work tasks.  He also opined that O'Brien is incapable of tolerating even low-stress jobs because she has constant pain in her

---

[32]Omentum is a layer of connective tissue passing from the stomach to another abdominal organ.  Stedman's at 1364.

- 13 -

lower extremities from sitting, standing, or walking.  He further opined
that O'Brien can walk one block without rest or severe pain; sit for
twenty minutes at a time before needing to recline; stand for fifteen
minutes at a time before needing to recline; and sit and stand or walk
in total for less than two hours in an eight-hour workday.  (Tr. 488.)

      Dr. Chao also opined that O'Brien did not need to walk around during
an eight-hour workday; would need to shift positions at will from
sitting, standing, or walking; would need more than ten unscheduled
breaks to rest during an eight-hour workday; would need to rest for more
than two hours on average before returning to work; should rarely lift
and carry less than ten pounds; and never lift and carry ten pounds or
more. (Tr. 489.)   Dr. Chao stated that the earliest date that this
description of limitation applied was July 2003.  He also stated that
O'Brien cannot concentrate or bend over because of abdominal pain; feels
like she is a burden to her husband and daughter because her quality of
life is limited because of pain; and gets anxiety from her pain and lack
of things she is able to do, which leads to depression.  (Tr. 490.)

**Testimony at the Hearing**

      On October 21, 2008, O'Brien appeared and testified to the following
at a hearing before an ALJ.  (Tr. 17-47.)  She is married and lives with
her husband and ten-year-old daughter.  She completed fourteen hours of
college and has had two months of job-related training on QuickBooks.
(Tr. 21-22.)

      She drives three to five days a week, usually to pick her daughter
up at school, although she cannot drive for six or eight weeks after
having a surgery.  She has pain when she drives for long distances.  She
last worked for three months around March or April, 2003, setting up
QuickBooks. She stopped working because she had finished setting up the
program.  Before that, she worked from 1995 through 1998 at Walden
Journeygan as an office manager, where she did payroll, filing, answered
phones, and set up appointments.  Before that, she worked in 1995 at
Wemsco Data Service as a bookkeeper.  (Tr. 23-24.)   In 1994, she worked
doing inventory control for Habasit Globe, Inc., which she left to take
another job at Architectural.  (Tr. 25.)   In 2001, she worked eight to

ten times over a year cutting grass for her brother-in-law's lawn care business. (Tr. 26, 37-38.)

She had a complete hysterectomy on July 12, 2003, and had to have bowel repair because her organs were wadded up in adhesions and pulling off the layers of her bowels. Her adhesions continued to cause her pain, particularly because she does not have an omentum, which means that her adhesions attach to her abdominal wall directly. She did not have pain immediately after bowel repair and adhesion surgeries, but it eventually returned as she began doing normal things. She had problems lifting and carrying things from July 2003 through December 2003 because of the pain in her lower left abdomen. During that time, she was told by Dr. Monterubio and Dr. Pruitt to refrain from lifting or carrying more than ten pounds, and she could hold only twenty to twenty-five pounds for about ten or fifteen minutes before having throbbing pain. Dr. Monterubio and Dr. Pruitt have since removed the ten-pound restriction, but still advise her against lifting or carrying more than ten pounds because she could develop hernias very easily. (Tr. 26-28.)

She first had hernia surgery in October 2005, and has had eight surgeries since July 2003. She has throbbing, pulling, tearing pain in her lower left abdomen when she sits for long periods of time. She has had this problem on-and-off since 2003 and 2004, but non-stop since 2005. The pain was not as bad from July 2003 through December 2003, and she could sit for an hour to an hour and a half then but only one half an hour or less now, and she is getting worse. In 2003, she was taking estrogen, Zoloft, Xanax, and Darvocet, which dulled the pain but made her sleepy. She would not have been able to work because her Darvocet made her sleepy and unable to concentrate. She is still taking these medicines. (Tr. 28-30.)

She first starting having depression and anxiety in February 2002. She was hospitalized when she had a breakdown and was diagnosed with depression, anxiety, and post traumatic stress disorder. She was suicidal at the time and was still having problems but was released because her insurance did not cover her hospital stay. Her husband is still working and she has insurance through him, although it does not cover a psychiatrist or psychologist. She still takes medication for her

- 15 -

depression, and her depression has worsened since 2002 because she is in pain constantly.  In 2003, her depression was a little better than when she was hospitalized, but she had crying spells two or three times a week from July 2003 to December 2003.  During this time, she also had problems sleeping, not wanting to get dressed or do daily chores, and taking care of her daughter.  Her sisters would help her by cleaning, doing some laundry, and taking care of her daughter.  This went on for a year after she went to the hospital, but needed her sisters' help less as she began doing things herself and with her husband's help.  (Tr. 30-34.)

Her main disabling condition in 2003 was her mental problems.  She is still mentally unstable because of her pain and still needs help doing the laundry.  She has pain when she walks or sits up straight, but usually has no pain if she is in a reclining position.  She had slept in a recliner every night for almost two years, but is trying to sleep in her bed.  (Tr. 34-35.)

In 2003, she was able to do the grocery shopping, but usually had someone with her to carry the heavy groceries.  At the time, she did not have difficulty walking unless she walked a lot, which would cause pain.  Her heart palpitations do not wake her up at night anymore because she takes Atenolol.  She has bad days at least four days a week, where she has difficulty sleeping because of pain, feels tired, is irritable, and cries.  (Tr. 38.)

When she has pain, she is not comfortable in any position.  Her doctors do not know what causes her adhesions.  She thinks about her pain a lot, which interferes with her ability to watch television and read books.  She cooks for her family but has help from her daughter and husband.  She does the vacuuming, mopping, and sweeping the best she can on good days.  When she has a good say she cleans the house, plays with her daughter, and does laundry with the help of her husband.  She usually has a bad day after having a good day.  On a normal day she reads, watches television, and talks on the phone.  She has been this limited since 2003, except she was also limited by depression then.  (Tr. 39-43.)

Vocational expert (VE) Brenda Young also testified at the hearing to the following.  O'Brien's past secretarial and bookkeeping work are semiskilled and sedentary; her retail salesclerk work is light and

- 16 -

unskilled; and her short-term lawn care work is unskilled and medium. The ALJ then asked the VE to assume a hypothetical individual who could perform sedentary work.  The VE testified that this individual could perform O'Brien's past clerical, inventory, secretarial, office manager, and bookkeeper work.  The ALJ then asked the VE to assume a second hypothetical individual who could perform sedentary work but also needed a sit/stand option and the ability to change positions at least every hour for fifteen minutes at a time.  The VE testified that this individual would be able to perform the clerical and office manager work. The ALJ then posed a third hypothetical individual who had the same limitations as the second individual but also could only perform jobs involving understanding, remembering, and following simple instructions and directions.  The VE testified that this individual could not perform any of O'Brien's past work or any other jobs.  (Tr. 43-46.)

### III.  DECISION OF THE ALJ

On January 2, 2009, the ALJ issued an unfavorable decision.  (Tr. 11-16.)  The ALJ began by finding that O'Brien's last date insured was December 31, 2003, and thus the issue was whether O'Brien was disabled between July 12, 2003 (alleged disability onset date) and December 31, 2003 (last date insured).[33]  (Tr. 11, 13.)

At Step One, the ALJ found that O'Brien had not engaged in substantial gainful activity since July 12, 2003.  At Step Two, the ALJ found that O'Brien suffered from the severe impairment of pelvic adhesions with chronic pelvic pain, but that she did not have severe impairments of anxiety or post traumatic stress disorder.  At Step Three, the ALJ found that O'Brien did not have an impairment or combination of

---

[33]To be eligible for Title II disability insurance benefits, a claimant must be insured for a period of disability, as set forth in 20 C.F.R. §§ 404.101, 404.130-404.133.  The ALJ determined that O'Brien's last insured date was December 31, 2003.  Accordingly, the relevant time period for assessing O'Brien's disability is between July 12, 2003 (the alleged disability onset date) and December 31, 2003 (last insured date). See Davidson v. Astrue, 501 F.3d 987, 989 (8th Cir. 2007).  Neither party challenges this portion of the ALJ's opinion.

impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 13.)

The ALJ then determined that O'Brien retained the residual functional capacity (RFC) to perform the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a).  The ALJ found that although O'Brien's medically determinable severe impairment could reasonably be expected to cause pain, her statements concerning the intensity, persistence, and limiting effects of her symptoms were not supported to the extent they were inconsistent with her RFC.  The ALJ also found no evidence of a severe mental impairment between July 2003 and December 2003, and that O'Brien's testimony was not fully credible.  (Tr. 14-15.)

At Step Four, the ALJ found that O'Brien retained the RFC to perform her past relevant work as a secretary, office manager, and bookkeeper as they are generally performed.  (Tr. 15.)  Accordingly, the ALJ found that O'Brien was not disabled.  (Tr. 15-16.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-

- 18 -

Fires, 564 F.3d at 942.   A five-step regulatory framework is used to
determine whether an individual qualifies for disability.   20 C.F.R.
§ 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987)
(describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) she is not
currently engaged in substantial gainful activity, (2) she suffers from
a severe impairment, and (3) her disability meets or equals a listed
impairment.   Pate-Fires, 564 F.3d at 942.   If the claimant does not
suffer from a listed impairment or its equivalent, the Commissioner's
analysis proceeds to Steps Four and Five.   Id.   Step Four requires the
Commissioner to consider whether the claimant retains the RFC to perform
past relevant work.   Id.   The claimant bears the burden of demonstrating
she is no longer able to return to his past relevant work.   Id.   If the
Commissioner determines the claimant cannot return to past relevant work,
the burden shifts to the Commissioner at Step Five to show the claimant
retains the RFC to perform other work.   Id.

In this case, the ALJ determined that although O'Brien suffers from
a severe impairment, she retains the RFC to perform her past relevant
work as a secretary, office manager, and bookkeeper.

## V.  DISCUSSION

O'Brien argues that the ALJ erred in not considering whether her
obesity was a severe impairment and in not considering the limitational
effects of her obesity on her RFC.   O'Brien also argues that the March
12, 2010 opinion of Dr. Chao, which was submitted to the Appeals Council,
undermines the ALJ's findings as to her mental impairments, pain, and
credibility.

## A.  Obesity

O'Brien argues that the ALJ erred in not considering whether her
obesity was a severe impairment and in not considering the limitational
effects of her obesity on her RFC.

To be a severe impairment at Step Two, an impairment must
"significantly limit[] [the claimant's] physical or mental ability to do
basic work activities."   20 C.F.R. § 404.1520(c); cf. 20 C.F.R.

§ 404.1521(a) ("An impairment . . . is not severe if it does not limit [a claimant's] physical or mental ability to do basic work activities.").

Records before, during, and after the relevant time frame regularly note O'Brien's obesity.  (Tr. 156-58, 162-63, 168-69, 233, 266-72, 377, 467-69.)  Each of these records, however, only indicate O'Brien's obesity; none of the records indicate any limitations or adverse health effects arising from her obesity.  Nor did O'Brien allege obesity as a basis for her disability in her application for benefits or mention her obesity or any limitations therefrom in her testimony at the administrative hearing.  (Tr. 21-43, 106.)  See Sullins v. Shalala, 25 F.3d 601, 604 (8th Cir. 1994) (finding it "noteworthy that [the claimant] did not allege a disabling mental impairment in her application for disability benefits, nor did she offer such an impairment as a basis for disability at her hearing" (internal citation omitted)).  Thus, while the record indicates that O'Brien was obese, there is no evidence that her obesity impaired her ability to perform basic work activities. Therefore, ALJ did not err in not finding O'Brien's obesity to be a severe impairment at Step Two.

In determining O'Brien's RFC, the ALJ found that O'Brien was limited to performing only the full range of sedentary work activities.  Given the lack of evidence that O'Brien's obesity limited her functional abilities, the ALJ's RFC determination was not deficient.  See Forte v. Barnhart, 377 F.3d 892, 896 (8th Cir. 2004) ("Although his treating doctors noted that [the claimant] was obese and should lose weight, none of them suggested his obesity imposed any work-related limitations, and he did not testify that his obesity imposed additional restrictions.").

**B.  Opinion of Dr. Chao**

O'Brien also argues that the March 12, 2010 opinion of Dr. Chao undermines the ALJ's findings as to her mental impairments, pain, and credibility.

O'Brien submitted Dr. Chao's March 12, 2010 opinion directly to the Appeals Council.  In denying O'Brien's request for review, the Appeals Council considered Dr. Chao's opinion and concluded that it did not provide a basis for changing the ALJ's decision.  (Tr. 1-2, 4-5.)

- 20 -

In his March 12, 2010 Physical Residual Functional Capacity Questionnaire, Dr. Chao opined that O'Brien had severe pain from abdominal adhesions, was depressed, and had anxiety, and that these impairments were severe enough to frequently interfere with her attention and concentration as needed to perform even simple work tasks.  He also opined that O'Brien is incapable of tolerating even low-stress jobs and could not concentrate because of her constant pain.  He further opined that O'Brien can walk one block without rest or severe pain; sit for twenty minutes at a time before needing to recline; stand for fifteen minutes at a time before needing to recline; sit and stand or walk in total for less than two hours in an eight-hour workday; did not need to walk around during an eight-hour workday; would need to shift positions at will from sitting, standing, or walking; would need more than ten unscheduled breaks to rest during an eight-hour workday; would need to rest for more than two hours on average before returning to work; should rarely lift and carry less than ten pounds; and should never lift and carry ten pounds or more.

The Appeals Council must consider evidence that is new, material, and relates to the period on or before the date of the ALJ's decision. Lamp v. Astrue, 531 F.3d 629, 632 (8th Cir. 2008).  To be material, the evidence must be "relevant to [the] claimant's condition for the time period for which benefits were denied."  Id.

The Appeals Council's statement that Dr. Chao's opinion "[did] not provide a basis for changing the [ALJ]'s decision" is interpreted as a finding that Dr. Chao's opinion was not material.  Aulston v. Astrue, 277 F. App'x 663, 664 (8th Cir. 2008) (per curiam); Helem v. Astrue, No. 4:09 CV 1827 AGF, 2011 WL 1258321, at *14 (E.D. Mo. Mar. 31, 2011).

Although he stated that the earliest date that this description of limitations applied was July 2003, Dr. Chao did not begin treating O'Brien until April 2007. (Tr. 127, 487-90.)  Dr. Chao did not state a basis for his opinion that O'Brien's limitations began in July 2003, or provide any medical records or evidence supporting this opinion. Moreover, Dr. Chao did not prepare the Questionnaire until over a year after the ALJ's decision.  On this basis, the Appeals Council's determination that the limitations set forth in Dr. Chao's March 12, 2010

opinion did not date back to July 2003 is supported by substantial evidence.[34]  See Helem, 2011 WL 1258321, at *15 (holding that the claimant's physician's opinion was not material because the assessment "was completed over a year after the ALJ's decision, and [the physician] did not begin treating [the claimant] until at least a month after the ALJ's decision"); see also Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) ("A physician's statement that is not supported by diagnoses based on objective evidence will not support a finding of disability." (citation omitted)); Rehder v. Apfel, 205 F.3d 1056, 1061 (8th Cir. 2000) (holding that a non-treating psychologist's report that was completed fourteen months after the relevant time period was not probative of the claimant's condition during the relative time period).

Therefore, the Appeals Council did not err in concluding that Dr. Chao's March 12, 2010 opinion was not material to O'Brien's application for disability insurance benefits.

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed.  An appropriate Judgment Order is issued herewith.

```
          /S/   David D. Noce
UNITED STATES MAGISTRATE JUDGE
```

Signed on January 30, 2012.

---

[34]Because substantial evidence supports the Appeals Council's conclusion that Dr. Chao's March 12, 2010 opinion did not relate to the relevant time period, O'Brien's arguments that Dr. Chao's March 12, 2010 opinion undermines the ALJ's findings as to her mental impairments, pain, and credibility are without merit.  See Martin v. Astrue, No. 4:10 CV 1507 JCH/FRB, 2011 WL 3352462, at *22 (E.D. Mo. July 15, 2011) (ALJ's decision was not contradicted by medical records that did not related to the relevant time period).